## BUDGETARY ADMINISTRATION

**BOARD OF PUBLIC WORKS – ADMINISTRATIVE LAW – REDUCTION OF APPROPRIATIONS – WHETHER THE BOARD OF PUBLIC WORKS MAY RECONSIDER ITS PRIOR APPROVAL OF BUDGET REDUCTIONS PROPOSED BY THE GOVERNOR UNDER SECTION 7-213 OF THE STATE FINANCE & PROCUREMENT ARTICLE – WHETHER THE BOARD MAY IMPOSE CERTAIN CONDITIONS ON APPROVAL OF SUCH REDUCTIONS.**

March 22, 2021

*John T. Gontrum, Esquire*
*Executive Secretary, Board of Public Works*

You have requested our opinion on two questions relating to the authority of the Board of Public Works (the "Board") to approve the reduction of an appropriation in the budget under the Maryland statute that allows for such reductions. *See* Md. Code Ann., State Fin. & Proc. ("SFP") § 7-213. First, you ask what authority the Board has to reconsider a reduction that it has approved. Second, you ask whether the Board, when approving a reduction, may provide that "the fulfillment of specified conditions" would either automatically rescind the Board's approval of the reduction or automatically require that the Board reconsider the reduction.

As to your first question, in our opinion, the Board may reconsider and rescind its vote approving a reduction under SFP § 7-213 up until the time the reduction takes effect. After a reduction takes effect, however, the Board lacks the power to reconsider its approval, rescind its approval, or otherwise restore the appropriation. As for when the reduction takes effect, a reduction implemented through a budget amendment under SFP § 7-209—the way that such reductions have historically been implemented—takes effect "when the Governor sends notice of the amended appropriation to the Comptroller." SFP § 7-209(g). A reduction that is not implemented using the budget amendment procedures in § 7-209 would take effect when the Governor signs the document implementing the reduction, unless the document specifies an effective date, in which case the reduction would take effect on that date.

As to your second question, there is significant uncertainty as to whether the Board may impose *any* conditions when exercising its authority under SFP § 7-213, let alone a condition that would result in automatic rescission or reconsideration of the Board's approval of a budget reduction based on the future occurrence of some specified event.  Although it is often the case that the express power of an agency to disapprove an action carries with it the implicit power to approve that action with conditions, we have serious doubts that the General Assembly intended to grant the Board authority to impose conditions under SFP § 7-213, given the Board's especially narrow role under the statute and the constitutional questions that could arise by allowing the Board to impose conditions.  While we cannot say with certainty that the Board categorically lacks the power to impose a condition providing for automatic rescission of its approval upon the occurrence of a specified event, the Board could achieve essentially the same result, without raising any questions as to the legality of its actions, simply by deferring a vote on the Governor's proposed reductions (or declining to approve those reductions) until after the contemplated event has (or has not) come to pass.  For that reason, we advise the Board against imposing any such conditions, given the legal uncertainty of that approach and the availability of an unquestionably legal alternative.

# I
# Background

## A. *The State Budget Process*

Maryland's budget system was established in 1916 by an amendment to the State Constitution.  Md. Const., Art. III, § 52; 1916 Md. Laws, ch. 159.  Under the present budget system, the Governor submits to the General Assembly each January a budget for the upcoming fiscal year, which shall "contain a complete plan of proposed expenditures and estimated revenues for said fiscal year,"[1] along with a budget bill containing all of the appropriations to authorize the proposed expenditures.  Md. Const., Art. III, § 52(3) and (5).  In developing the spending plan, the Governor may revise the spending estimates proposed by State agencies,

---

[1] That "complete plan" is embodied in the budget books, a multi-volume publication that details the State's annual operating budget, organized by unit of State government.  Letter from Richard E. Israel, Assistant Attorney General, to the Honorable R. Clayton Mitchell, Speaker of the House of Delegates (Jan. 10, 1991).

except those for the General Assembly, for the Judiciary, and for the public schools, as provided by law. *Id.* § 52(11). Similarly, for those programs for which a law prescribes a level of funding, the Governor may not reduce the estimate below the level prescribed by law. *Id.* § 52(12). After the submission of the budget bill to the General Assembly (until it is finally acted upon), the Governor may, with the General Assembly's consent, amend or supplement the budget bill. *Id.* § 52(5).

Except for appropriations relating to the legislative and judicial branches, the General Assembly may only "strike out or reduce" items of appropriation.[2] Md. Const., Art. III, § 52(6). It may not amend the budget bill so as to increase an appropriation for an executive branch program. *Id.* If the General Assembly wants to initiate an appropriation for an executive branch program, it may do so only by way of a supplementary appropriation bill, which must be embodied in a separate bill limited to a single purpose and must levy a tax to support the appropriation.[3] *Id.* § 52(2) and (8). "In this manner the Governor and the General Assembly together, with the Governor having a preeminent role, enact a budget for the ensuing fiscal year based on departmental estimates of needs and on estimated revenues." *Judy v. Schaefer*, 331 Md. 239, 250 (1993). This design was meant to ensure a balanced State budget, and since 1974, Article III, § 52(5a) has "expressly mandate[d] that the Governor propose and maintain a balanced budget." *Judy*, 331 Md. at 249.[4]

---

[2] The General Assembly may not amend the budget bill so as to affect State debt obligations, the provisions made by law for the establishment and maintenance of public schools, or the payment of constitutionally mandated salaries, nor may it amend the budget bill to decrease the salary or compensation of any public officer during the officer's term of office. Md. Const., Art. III, § 52(6).

[3] A constitutional amendment ratified by the voters at the general election on November 3, 2020, authorizes the General Assembly, beginning with the Fiscal Year 2024 budget bill, to increase or add items for executive branch programs, provided the total of appropriations for executive branch programs does not exceed the total proposed by the Governor. 2020 Md. Laws, ch. 645.

[4] Subsection (5a) was added to Article III, § 52 by 1973 Md. Laws, ch. 745. It states:

> The Budget and the Budget Bill as submitted by the Governor to the General Assembly shall have a figure for the total of all proposed appropriations and a figure for the total of all estimated revenues available to pay the

The State's budget system was adopted at the recommendation of the Commission on Efficiency and Economy (known as the "Goodnow Commission"), which had been directed by the Democratic Party platform to consider two options for who would play that dominant role in the budget process, i.e., who would make the final budget estimates for submission to the General Assembly: either the Governor alone or the Board of Public Works, which is composed of the Governor, the Comptroller, and the Treasurer. Report of the Commission on Economy and Efficiency on a Budget System, Maryland Senate Journal, 1916 Sess., at 129-134 (Jan. 28, 1916) ("Goodnow Report"); *see also* Alan M. Wilner, *The Maryland Board of Public Works: A History* 80 (1984). The rationale for selecting the Governor, rather than the Board, was explained in the Goodnow Report as follows:

> We have concluded that this responsibility should be placed upon the Governor. We have felt that to make use of the Board of Public Works as a Budget Commission would have the disadvantage of dissipating personal responsibility for financial propositions, and would also run the risk of not securing party responsibility.

Goodnow Report at 131.

---

> appropriations, and the figure for total proposed appropriations shall not exceed the figure for total estimated revenues. Neither the Governor in submitting an amendment or supplement to the Budget Bill nor the General Assembly in amending the Budget Bill shall thereby cause the figure for total proposed appropriations to exceed the figure for total estimated revenues, including any revisions, and in the Budget Bill as enacted the figure for total estimated revenues *always shall be* equal to or exceed the figure for total appropriations.

(emphasis added). This requirement is an ongoing one that applies not just at the time of the budget's enactment. *See Judy*, 331 Md. at 260 (rejecting as inconsistent with the language and history of Article III, § 52 the contention "that the balanced budget requirement was intended to apply only during the preparation of the budget and its passage"). At the same time, we have recognized that it is not "constitutionally necessary for the Budget to in fact be balanced *subsequent* to its enactment at every moment in time throughout the fiscal year." 61 *Opinions of the Attorney General* 59, 60 (1976) (emphasis in original).

## B.    *The Budget Reduction Statute*

Aside from the ongoing requirement to maintain a balanced budget, Article III, § 52 does not speak to the administration of the State budget after its enactment.  It does, however, authorize the General Assembly to enact "such laws not inconsistent with" that section as may be "necessary and proper" to carry out its provisions.  Md. Const., Art. III, § 52(13).  Pursuant to that provision, the General Assembly has established a statutory scheme for the administration of the budget.

Much of that statutory scheme is codified in Division I of the State Finance and Procurement Article.  Title 7 deals with appropriations, and Subtitle 2 of Title 7 deals with the disbursement and expenditure of appropriated funds.  Under those provisions, "[m]oney may be disbursed from the State Treasury only in accordance with the current appropriation for a program as amended from time to time in accordance with [Title 7]."  SFP § 7-205.  While "[t]he initial appropriation for a program is set forth in the appropriation act[,] . . . the appropriation for a program may be increased or reduced as provided in [Title 7, Subtitle 2]."  SFP § 7-206.

As is especially relevant here, there are two statutes that authorize the Governor to amend appropriations for executive branch programs after the enactment of the budget bill.  First, under SFP § 7-209, the Governor may amend an appropriation for a program of the Office of the Governor or, on the request of an officer or unit of the Executive Branch, approve an amendment of an appropriation for a program of that officer or unit.  This authority is subject to certain limitations.  Most significantly, an amendment of an appropriation generally may not increase the sum of appropriations from the General Fund for all programs of the officer or unit.  SFP § 7-209(c)(1).[5]

Second, the Governor also may amend an appropriation pursuant to SFP § 7-213, commonly known as the "budget reduction statute," which allows the Governor, "with the approval of the Board of Public Works, [to] reduce, by not more than 25%, any appropriation: (i) that the Governor considers unnecessary; or (ii) that is subject to budgetary reductions required under the budget bill as approved by the General Assembly."  This authority

---

[5] The exception to this rule is that an amendment may increase the sum of appropriations from the General Fund for all programs of the officer or unit if money from the Board's Contingent Fund is transferred to the program.  SFP § 7-209(c)(2).

to reduce appropriations is subject to a number of exclusions. The Governor may not reduce an appropriation for the legislative or judicial branches, for the payment of the principal of or interest on State debt, for the public schools, the Maryland School for the Deaf or the Maryland School for the Blind, for the salary of public officers during their term of office or, except as provided in § 8-109 of the State Personnel & Pensions Article, for the salary of a non-temporary employee in the State Personnel Management System. SFP § 7-213(b).[6] Many of these exclusions mirror the provisions in Article III, § 52 that preclude the Governor from revising certain spending estimates in the proposed budget. *See* Md. Const., Art. III, § 52(11), (12).

These statutory powers date back to the 1939 Budget and Procurement Act[7] and had earlier been enacted as part of the biennial budget bills.[8] *See Judy*, 331 Md. at 251-52; Wilner, *The Maryland Board of Public Works*, *supra*, at 84-85. The first budget bill after the ratification of § 52, enacted at the 1918 session, provided that the "schedules" for each appropriation are to "represent the initial plan of distribution and apportionment of the appropriations to which they, respectively, refer," but that "such Schedule may be amended" as provided therein. 1918 Md. Laws, ch. 206, § 3. This "concept of the budget bill being an 'initial plan of disbursement' has been an element of the executive budget system since its enactment." *Judy*, 331 Md. at 252-53.

During the Great Depression, so that the State could better respond to the effects of the Depression on the State's finances, additional budget administration provisions, originally intended as emergency measures, were incorporated into the budget bills. Wilner, *The Maryland Board of Public Works*, *supra*, at 84; 65 *Opinions of the Attorney General* 45, 46-48 (1980). The budget bills enacted during the legislative sessions of 1933 and 1935 authorized the Board of Public Works to "supervise the expenditure

---

[6] In interpreting the exclusion for an appropriation for the salary of a non-temporary employee in the State Personnel Management System, we have said that it does not preclude the elimination of funding for positions but merely preserves the procedures in § 8-109 of the State Personnel & Pensions Article for categorical decreases in rates of pay. 76 *Opinions of the Attorney General* 330, 337 n.9 (1991); 75 *Opinions of the Attorney General* 366, 369 n.5 (1990).

[7] 1939 Md. Laws, ch. 64.

[8] Until 1949, the General Assembly met every other year and would enact a budget bill covering the next two fiscal years.

of all appropriations . . . in [the] budget" and provided that "for that purpose the said Board shall have the power to reduce or eliminate any appropriation which it may deem unnecessary," except appropriations for debt service or for the legislative or judicial branches. 1933 Md. Laws, ch. 597, § 11; 1935 Md. Laws, ch. 92, § 11. Similar authority was not included in the budget bill passed at the 1937 session, but the Budget and Procurement Act of 1939, which codified many of the budget administration provisions previously enacted in each budget bill, reinstituted the power to reduce appropriations, though it vested that authority in the Governor rather than the Board.

The 1939 Act was originally codified as Article 15A. Section 9 of former Article 15A is the direct predecessor to the current budget reduction statute, SFP § 7-213, and like the current statute it authorized the Governor, with the approval of the Board, to reduce by not more than 25% any item of appropriation that the Governor deemed unnecessary, except appropriations for certain purposes identified therein. 1939 Md. Laws, ch. 64. "The General Assembly [was] well aware of the problem in the 1930[s] and the possibility of its recurrence, [and it] enacted [the budget reduction statute] in 1939 in order to forestall the accumulation of deficits in subsequent fiscal years." *Judy*, 331 Md. at 259. The purpose of that statute "is to enable the State to accommodate an unexpected decrease in anticipated State revenues and, notwithstanding the vagaries of the economy, to maintain a balanced budget, one of the principal goals of the framers of the Budget Amendment." 65 *Opinions of the Attorney General* at 48.[9]

While this Office has, on occasion, described the reduction statute as delegating to the Governor the General Assembly's authority to "strike or reduce" items of appropriation in the budget, the Court of Appeals has observed that "it is not particularly useful to characterize" the statute as effecting a delegation of legislative authority, given that Article III, § 52 "greatly expanded the gubernatorial role" with respect to the State budget. *Judy*, 331 Md. at 262 n.18. As the Court of Appeals put it, "[t]he authority given to the Governor in § 7-213 corresponds to the power vested in the Governor by Art. III, § 52," and § 7-213 "merely allows the Governor to accomplish at the end of the budget process what he is required to do when he submits his initial budget." *Id*. at 259-60. Indeed, the Court held that § 7-213 was a constitutional exercise of

---

[9] For further discussion of the history of the budget reduction statute and the major State budgetary actions prompted by the economic depression of the 1930s, see 65 *Opinions of the Attorney General* at 46-48; Wilner, *The Maryland Board of Public Works*, *supra*, at 84-87.

the General Assembly's power to enact laws "not inconsistent with" Article III, § 52, in part because the statute was consistent with the preeminent role given to the Governor over the budget under the Maryland Constitution. More specifically, the Court explained:

> the statute recognizes and perpetuates the preeminent role of the Governor in the budget process, a role considered by the Goodnow Commission to be "fundamental . . . for a sound budget system." Furthermore, because § 7-213 furthers the requirement of maintaining a balanced budget throughout the fiscal year, it is precisely the type of legislation which the framers of Art. III, § 52, contemplated.

*Id.* (citations omitted).

It is evident from the plain language of § 7-213, as well as the cases and our opinions interpreting the statute, that the authority to make reductions to appropriations is vested exclusively in the Governor, subject to the limitations set out in statute, including the limitation that the Governor may reduce an appropriation only after securing the Board's approval. Under the budget reduction statute, "the Governor, and only the Governor, can reduce appropriations in the budget up to 25% after the budget has been enacted." *Workers' Comp. Comm'n v. Driver*, 336 Md. 105, 119 (1994). As our Office has long explained, therefore, the Board "may not substitute its own reductions for those of the Governor," Letter from J. Joseph Curran, Jr., Attorney General, to William S. Ratchford, II, Director, Dep't of Fiscal Services, at 3 (Oct. 3, 1991) ("Curran Letter"), though the Board may decline to approve one or more of the Governor's proposed reductions or may seek to persuade the Governor to change the proposal.

## C. *The Board of Public Works*

The Board of Public Works, which consists of the Governor, Comptroller, and Treasurer, is established by Article XII of the Maryland Constitution. Although established by the Constitution, the powers and duties specifically vested in the Board by the Constitution are quite narrow and "are now largely obsolete." *Building Materials Corp. of Am. v. Board of Educ. of Baltimore County*, 428 Md. 572, 578 n.4 (2012). Apart from the Board's

limited duties relating to certain canal and railroad companies, it exercises only those powers that are conferred on it by the General Assembly. *See* Md. Const., Art XII, § 1 (providing for the creation of the Board to "hear and determine such matters as affect the Public Works of the State, and as the General Assembly may confer upon them the power to decide"); 76 *Opinions of the Attorney General* 46, 49 (1991) ("Except for imposing some anachronistic duties relating to canal and railroad companies, the constitutional provisions relating to the Board of Public Works simply defer to the General Assembly's power to legislate. . . ."); 62 *Opinions of the Attorney General* 716, 725-27 (1977) (concluding that the Board's powers with respect to the "Public Works of the State" are "circumscribed by the Legislature"); *see also Truitt v. Board of Public Works*, 243 Md. 375, 388 (1966) (holding that the Board, in executing administrative functions, is subject to "the operation of the legal principles applicable to administrative agencies").

## II
## Analysis

### A.   *Reconsideration of the Board's Approval*

You have first asked for guidance regarding the Board's authority to reconsider a prior vote to approve the reduction of an appropriation pursuant to SFP § 7-213.  We have answered this question before, though not in the form of an official opinion of the Attorney General.  In a 1991 letter of advice, Attorney General Curran expressed the view that the Board was free to reconsider and rescind its approval up until the time the reduction takes effect.  Curran Letter at 3.  On that occasion, the Board had approved, the day earlier, the Governor's plan to reduce a number of appropriations for Fiscal Year 1992, with the reductions to be implemented by way of a master budget amendment under SFP § 7-209.  In concluding that the Board could reconsider its approval of the reductions, the Attorney General explained:

> Under accepted principles of parliamentary law, a public body may reconsider an action until that action has gone into effect or the matter is beyond the control of the body. In the absence of a rule adopted by the body, there is no time limit on a motion to reconsider.  The general principle is that "all deliberative bodies have a right . . . to reconsider their proceedings as they deem

proper, and it is the final result only which is to be regarded as the thing done."

Because the Governor's reduction plan contemplates that it will be implemented by the processing of a master administrative budget amendment under § 7-209 of the State Finance and Procurement Article, it is our view that the Board's action will not have gone into effect until it is implemented as proposed, when the Governor's master budget amendment takes effect. Thus, until that time, the Board could reconsider its decision. However, once the budget amendment has become effective, the appropriation schedules will have been revised in accordance with the Board's approval of the Governor's decision and the time for reconsideration will have passed.

After the time for reconsideration has passed, the Board may not act to restore any of the appropriations that were reduced. Unlike the General Assembly, the Board has no plenary authority to revisit past decisions. It has only the authority given it by statute, and neither § 7-213 nor any other statute authorizes it to restore an appropriation once it has been reduced.

Curran Letter at 3 (alterations in original) (footnotes and citations omitted).

We agree with that basic premise, i.e., that the Board may reconsider its approval of a reduction under § 7-213 up until the time the reduction takes effect. When the Board votes on the Governor's proposed reduction, its actions are quasi-legislative in nature. *Judy*, 331 Md. at 266. A body acting in a legislative or quasi-legislative capacity, in turn, generally possesses the inherent power to reconsider and rescind its actions until the relevant action has been completed or the matter is otherwise beyond the control of the body, provided that vested rights of third parties are not violated and rescission is consistent with applicable law and the rules governing the body. *See Dal Maso v. Board of County Comm'rs of Prince George's County*, 182 Md. 200, 206-07 (1943)

(explaining that "boards and agencies to which legislative power has been delegated . . . may undo, consider and reconsider their action upon measures before them," at least "before the rights of third parties have vested" and "in the absence of statute or a rule to the contrary"); *see also State v. Womack*, 29 P. 939, 942 (Wash. 1892) ("[T]he general rule is that a legislative or deliberative body of any kind has power to reconsider any of its actions. When not regulated by statute, the body has a right to adopt its own rules as to the time when reconsideration can be moved."); 4 McQuillin Mun. Corp. § 13:75 (3d ed.) ("[T]he legislative body of [a municipal] corporation, or any of its boards or departments, possesses the unquestioned power to rescind prior acts[] and votes at any subsequent time until the act or vote is complete, provided vested rights are not violated, and that such rescission is in conformity to the law applicable and the rules and regulations adopted for the government of the body."); Mason's Manual of Legislative Procedure § 451 (2010) (explaining that, although a legislative body generally may reconsider its actions, "[a]n action cannot be reconsidered when, for any reason, it is not possible to cancel, nullify, or void the action previously taken").[10]

Applying those general principles here, neither § 7-213 nor any other statute prohibits the Board from reconsidering its vote to approve a reduction. It is also our understanding that the Board has not adopted any formal procedures that would prohibit it from reconsidering its vote. As such, the Board may exercise its usual procedures for reconsideration, so long as the reduction has not yet been carried out and the matter remains within the Board's control.

Once the reduction has gone into effect, however, the Board cannot undo the reduction. When the Governor reduces an appropriation with the approval of the Board under § 7-213, the

---

[10] Conversely, when an administrative body acts in a quasi-judicial capacity and "is not otherwise constrained," it generally "may reconsider an action previously taken and come to a different conclusion upon a showing that the original action was the product of fraud, surprise, mistake, or inadvertence, or that some new or different factual situation exists that justifies the different conclusion," but not upon a "mere change of mind." *Calvert County Planning Comm'n v. Howlin Realty Mgmt., Inc.*, 364 Md. 301, 325 (2001). That standard might also apply to quasi-legislative actions when the standard is made applicable by law. *See Kay Const. Co. v. County Council for Montgomery County*, 227 Md. 479, 484, 486 (1962) (involving a zoning ordinance that allowed for reconsideration of certain quasi-legislative actions when "good cause [was] shown" and analogizing to the rule for reconsideration of quasi-judicial decisions).

effect of the action is to extinguish the legal authorization to withdraw those funds from the Treasury. *See Judy*, 331 Md. at 259-60, 264-66; *see also* 76 *Opinions of the Attorney General* 330, 337-39 (1991) (explaining that "when the funding for a position is eliminated under the direct or delegated authority of Article III, § 52 of the Constitution, the action is a legislative act with the force of law" and that following the budget reduction "no appropriation would exist" for the position); *cf.* 21 *Opinions of the Attorney General* 218, 219 (1936) (concluding, at a time when the Board had primary authority over budget reductions, that when an appropriation is reduced the amount of the reduction "reverts to the General Treasury of the State"). At that point, the relevant action has been completed, and there is no longer anything for the Board to reconsider, as neither § 7-213 nor any other statute authorizes the Board to restore an appropriation.[11] In other words, any attempt by the Board to rescind its approval after the reduction has gone into effect would be a legal nullity.[12]

The next question, then, is when a reduction, as approved by the Board, goes into effect. The usual practice has apparently been to implement budget reductions as budget amendments under SFP § 7-209. As to when such a budget amendment takes effect—thereby implementing the reduction and precluding any reconsideration—Attorney General Curran advised in a footnote to his 1991 letter that a budget amendment goes into effect on the effective date stated in the amendment or, if the amendment is silent about an effective date, when the Governor signs it. Curran

---

[11] We need not decide when, in other contexts, an action is sufficiently complete or beyond the control of a quasi-legislative body such that it can no longer be reconsidered. That may vary from context to context.

[12] As was the case in 1991, we are not called upon to address whether a statutory scheme that authorized the Board to restore an appropriation would be constitutional, because there is nothing in the statute that provides for such a restoration. Nonetheless, we think it worthwhile to offer a few observations. When the Governor reduces an appropriation with the approval of the Board under § 7-213, the legal authorization to withdraw those funds from the Treasury is eliminated. *Judy*, 331 Md. at 259-60. To the extent the act of restoring a previously reduced appropriation would amount to a new appropriation, that action would have to comply with the constitutional provisions governing the withdrawal of money from the Treasury, namely Article III, § 32, which prohibits the withdrawal of money from the Treasury except "in accordance with an appropriation by Law," and Article III, § 52, which provides that any law appropriating money from the Treasury "shall be either a Budget Bill, or a Supplementary Appropriation Bill."

Letter at 3 n.1. On this particular point, however, we reach a different conclusion. Section 7-209(g) expressly states that "[a]n amended appropriation for a program is effective when the Governor sends notice of the amended appropriation to the Comptroller." Thus, by the terms of the statute, a reduction implemented by budget amendment under § 7-209 takes effect when the Governor sends notice to the Comptroller, and it is our opinion that the Governor cannot provide otherwise by specifying a different effective date.

That said, § 7-209(g) is controlling on the question of when a reduction takes effect only if the reduction is processed as a budget amendment under that section. Although that is the usual practice, it does not appear that any provision of State law requires that a budget reduction approved under § 7-213 be implemented through a budget amendment under § 7-209 or that the procedures of § 7-209 be followed in implementing budget reductions, which are governed by a separate statutory provision.

If a budget reduction were to be processed in a different way, without reference to the budget amendment procedures in § 7-209, then the rule setting the effective date for budget amendments in § 7-209(g) would not apply.[13] In that event, consistent with what Attorney General Curran suggested in his 1991 advice letter, the reduction would likely go into effect on the effective date stated in the document implementing the reduction or, if the document does not specify an effective date, then on the date when the Governor signs the document. *See* Curran Letter at 3 n.1; *cf. Lapeyre v. United States*, 84 U.S. (17 Wall.) 191, 198-99 (1872) (plurality) (holding, based on historical practice, that a presidential proclamation took effect on the date that the President signed the proclamation and filed it with the Secretary of State); *City of Atlanta v. Mays*, 801 S.E.2d 1, 5 (Ga. 2017) (articulating a default rule that "a municipal ordinance becomes effective when it is signed and filed by the Mayor unless there is a constitutional or

---

[13] Although you did not ask, and we do not decide, exactly what an alternative process for implementing a reduction approved under § 7-213 might look like, we suspect that the Governor would have a fair amount of discretion in how such a reduction might be implemented, though it would presumably need to involve some form of notice to the Comptroller, as the officer responsible for issuing warrants for payment and charging them to appropriations. *See* SFP §§ 7-216, 7-220. Of course, if the Governor's overall reduction plan also involves moving funds between programs as contemplated by a budget amendment under § 7-209 in addition to budget reductions, that aspect of the plan at least would have to be processed as a budget amendment under § 7-209.

general statutory provision governing the matter"); 5 McQuillin Mun. Corp. § 15:37 (3d ed.) ("The common rule in regard to legislation is that it shall take immediate effect unless otherwise provided."); Letter from Richard E. Israel, Assistant Attorney General, to Sen. Richard F. Colburn (July 31, 1997) (concluding that common-law rule in Maryland under the Constitution of 1776 was that statutes took effect from the date of passage unless otherwise specified).

## B.  *Conditional Approval of Reduction*

Your second question is whether the Board can condition its approval of the Governor's decision to reduce an appropriation such that "the fulfillment of specified conditions" would automatically rescind the Board's approval or require that the Board reconsider the reduction(s). Although you do not explain in the request what "specified conditions" the Board might have in mind, it is our understanding that the specified conditions would likely relate to new factual information reflecting the fiscal health of the State, such as actual revenue taken in by the State, the amount of the next revenue estimates issued by the Board of Revenue Estimates, or the projected budget shortfall based on those revenue estimates.[14]

In answering this question, the first issue that must be resolved is whether the Board has any power to place conditions on its approval at all. If the Board has the power to impose conditions under at least some circumstances, the next step of the analysis is to identify what limitations there are on the Board's power. The final step is to determine whether the Board can condition its approval to provide for automatic rescission or to require that the Board reconsider the reduction(s).

As to whether the Board can condition its approval, that is primarily a question of legislative intent. *See Board of Liquor License Comm'rs for Baltimore City v. Hollywood Prods., Inc.*, 344 Md. 2, 10-11 (1996). The "primary source of legislative intent is,

---

[14] The Board of Revenue Estimates consists of the Comptroller, the Treasurer, and the Secretary of Budget and Management. SFP § 6-102. It submits to the Governor and General Assembly each December, March, and September a report that contains an itemized statement of estimated State revenues. SFP § 6-106. For the purpose of preparing those reports, the Board studies the revenue estimates prepared by the Bureau of Revenue Estimates in collaboration with the Consensus Revenue Monitoring and Forecasting Group. SFP §§ 6-104 to 6-106.

of course, the language of the statute itself." *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 73 (1986). Here, there is also the further consideration of whether the statute, if read to permit the Board to impose conditions, would be "inconsistent with" Article III, § 52, and thus invalid under that constitutional provision. *See Judy*, 331 Md. at 259-60.

Starting with the language of the statute, the text of SFP § 7-213 is silent on this point. It neither expressly authorizes the Board to approve a reduction with conditions nor expressly prohibits the Board from doing so. We must thus determine whether the power to impose conditions—including the specific type of condition about which you ask—is implicit in the statutory scheme.

Although the Board in this context has only the powers and duties granted to it by the Legislature, 76 *Opinions of the Attorney General* at 49, the general rule in Maryland is that an agency, in addition to having the powers expressly granted by statute, has all of the powers that are necessary to, fairly implied by, or incident to the exercise of its express powers and duties. *See, e.g.*, *River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 543 (2007); *Department of Econ. & Emp't Dev. v. Lilley*, 106 Md. App. 744, 760 (1995); 73 C.J.S. Public Admin. Law & Proc. § 150. That is, an agency generally has "reasonable discretion to carry out 'fairly implied' powers incident to those duties or authority expressly granted." *Town of La Plata v. Faison-Rosewick LLC*, 434 Md. 496, 523 (2013).[15] An agency may not, however, exercise any power which is "inconsistent or out of harmony with" the statute being

---

[15] Although some of our prior opinions state that implied powers must be "necessary" to carry out the agency's express powers and duties, *see, e.g.*, 76 *Opinions of the Attorney General* 137, 137-38 (1991), it does not appear that strict necessity is required. Rather, the Court of Appeals seems to use the terms "necessary," "fairly implied," and "incident to" interchangeably when evaluating an agency's implied powers. *See Twigg*, 396 Md. at 543; *Faison-Rosewick*, 434 Md. at 523. Thus, the term "necessary" apparently refers to something like *reasonable* necessity. *See Faison-Rosewick*, 434 Md. at 523-24 (finding that an officer had the implied power to exercise "reasonable means" to carry out an express duty); *Lilley*, 106 Md. App. at 760 ("An expressed legislative grant of power or authority to an administrative agency includes the grant of power to do all that is reasonably necessary to execute that power or authority." (internal quotation marks omitted)); *cf.* 64 *Opinions of the Attorney General* 229, 231 (1979) (explaining in the context of a delegation from an agency head to a subordinate that "a delegation of authority includes not only express powers, but also those necessarily implied and reasonably necessary to effectuate the express powers granted to a delegatee").

administered. *Insurance Comm'r v. Bankers Indep. Ins. Co.*, 326 Md. 617, 624 (1992).

Under that standard, the extent of an agency's implied powers can sometimes depend on the breadth of the express powers provided to that agency. *See Thanner Enters. v. Baltimore County*, 414 Md. 265, 279 (2010). When the General Assembly has delegated broad express authority to an agency in an area, for example, courts will typically construe the scope of the agency's implied powers in that area broadly as well. *See, e.g.*, *Lussier v. Maryland Racing Comm'n*, 343 Md. 681, 688 (1996); *Christ ex rel. Christ v. Maryland Dep't of Nat. Res.*, 335 Md. 427, 440 (1994); *McCullough v. Wittner*, 314 Md. 602, 610-12 (1989). By contrast, when an agency has been delegated only narrow authority by the Legislature, the agency's implied powers may be narrower. *See, e.g.*, 62 *Opinions of the Attorney General* at 724-28 (concluding that the Board of Public Works did not have the implied power to require an agency to negotiate with a particular firm, because the statute "committed to the [agency]" the responsibility to conduct the selection process and limited the Board's role to merely approving or disapproving the agency's proposed firm). And at the far end of the spectrum, when the Legislature has decided to "closely control by statute even the more detailed aspects" of the agency's authority, that sort of "comprehensive statutory scheme" suggests that the agency's implied authority is "more circumscribed than the typical administrative body." *Hollywood Prods.*, 344 Md. at 13 (involving a local liquor board).

The touchstone for determining whether an agency has the implied authority to take a particular action is ultimately "the General Assembly's intent in empowering an agency and the statutory scheme under which the agency acts." *Thanner Enters.*, 414 Md. at 279 (quoting *Hollywood Prods.*, 344 Md. at 11); *see also Lussier*, 343 Md. at 686 ("[I]n determining whether a state administrative agency is authorized to act in a particular manner, the statutes, legislative background and policies pertinent to that agency are controlling.").

The basic question here, then, is whether the power to place conditions on its approval is "fairly implied" from the Board's power to approve or disapprove a reduction to the budget proposed by the Governor under SFP § 7-213. To answer that question, we look first to the general rules governing the power of administrative agencies to impose conditions and second to how those general rules might apply to the more specific context at hand.

As a general rule, the federal courts and courts in other states have often held that "[t]he power to approve implies the power to disapprove and the power to disapprove necessarily includes the lesser power to condition an approval." *Southern Pac. Co. v. Olympian Dredging Co.*, 260 U.S. 205, 208 (1922) (concluding that the Secretary of War had the power to impose a condition on his approval to construct a bridge over the waters of the United States in light of his power to disapprove construction of the bridge entirely); *see also Mello v. License Comm'n of Revere*, 759 N.E.2d 1201, 1203 (Mass. 2001); *State v. Crown Zellerbach Corp.*, 602 P.2d 1172, 1175 (Wash. 1979) (en banc); *Turf Paradise, Inc. v. Arizona Racing Comm'n*, 772 P.2d 595, 598 (Ariz. Ct. App. 1989); N.C. Op. Att'y Gen., 2003 WL 1154487, at *4 (Feb. 18, 2003).

Although the Maryland courts have not yet articulated that rule in precisely that way, they have recognized the same general principle, or at least a similar principle, in various contexts. *See, e.g.*, *In re Diener*, 268 Md. 659, 683 (1973) (concluding that the grant of the "greater power" to the Commission on Judicial Disabilities under the Constitution to recommend that a judge be removed "impliedly includes the lesser" power to recommend that a judge be sanctioned); *County Council of Montgomery County v. Lee*, 219 Md. 209, 215 (1959) (concluding that "the right to grant or withhold permission for the paving of Galena Road . . . carries with it the right to prescribe reasonable terms and conditions upon which the permit would issue"); *Blaker v. State Bd. of Chiropractic Examiners*, 123 Md. App. 243, 264-65 (1998) (concluding that the power of the Board of Chiropractic Examiners to place a licensee on probation, which was expressly conferred on the Board, necessarily included the implicit authority to place terms and conditions on probation, since without that authority the Board could not monitor licensees and protect the public from harm).

A variation on that general principle has been applied by the Court of Appeals (and by our Office) in defining the scope of the General Assembly's constitutional powers to "strike out or reduce" items in the budget bill. More specifically, both the Court of Appeals and our Office have long reasoned that the General Assembly's power to "strike out or reduce" items of appropriation includes the lesser power "to condition or limit the use of money appropriated, or the use of the facility for which the money is appropriated." *Bayne v. Secretary of State*, 283 Md. 560, 574 (1978); *see also Kopp v. Schrader*, 459 Md. 494, 509 (2018); 37 *Opinions of the Attorney General* 139, 141-42 (1952). Thus, in acting on the budget bill, the General Assembly may approve a proposed item of appropriation by enacting the bill without

amendment, it may disapprove a proposed item in whole or in part by exercising its express power to "strike out or reduce," or it may exercise its lesser power to approve a proposed item subject to limitations or conditions, with the caveat that the power to condition appropriations is constrained to some degree by the purpose of Article III, § 52 and the design of the constitutional budget process.[16] *See also* 101 *Opinions of the Attorney General* 35, 55 (2016) (recognizing that, as to local governments too, "[n]ormally, the authority to appropriate funds—and to reduce or eliminate an appropriation—includes an implicit authority to set conditions").

More to the point, we have also found that similar principles apply to the Board of Public Works itself, concluding in a series of opinions that the Board had implied authority under various statutory schemes to impose conditions or other requirements in light of its express authority to approve or disapprove actions pursuant to those statutes. *See* 64 *Opinions of the Attorney General* 118, 121-23 (1979) (concluding that the Board of Public Works, given its broad powers over the school construction program, "may condition the acceptance of funds [by local jurisdictions] under the [program] in any manner that it considers necessary to assure the proper operation of the program and the prudent expenditure of State funds"); 62 *Opinions of the Attorney General* 743, 747 (1977) (concluding that, because the Board of Public Works had the power "to discharge a portion of the indebtedness of . . . community colleges" under a statute allowing it to settle obligations owed to the State, the Board "was also empowered to condition its decision in any manner reasonably designed to further the public interest" behind the statute); 61 *Opinions of the Attorney General* 491, 492, 494 (1976) (concluding that a statute that allowed the University of

---

[16] To be valid, a condition or limitation (1) must be "directly related to the expenditure of the sum appropriated," (2) may not "in essence, amend either substantive legislation or administrative rules adopted pursuant to legislative mandate," and (3) may be "effective only during the fiscal year for which the appropriation is made." *Bayne*, 283 Md. at 574; *see also Schrader*, 459 Md. at 509. This prohibition on "legislating in the budget," though not expressly articulated in the Constitution, is grounded in the limited function of the budget bill, which is to appropriate money, not to legislate generally, the General Assembly's limited power to strike out or reduce items of appropriation, and the fact that the budget bill, unlike substantive legislation, is not subject to veto by the Governor. *Schrader*, 459 Md. at 507, 509-10.

Maryland to expend certain surplus revenues "only if and as it secures the written approval of the Board of Public Works" authorized the Board to impose certain "requirement[s]" over the expenditure of those revenues).

The general principle on which those court decisions and opinions of the Attorney General rely, however, is not absolute. *See, e.g.*, *Board of Liquor License Comm'rs for Baltimore City v. Fells Point Cafe, Inc.*, 344 Md. 120, 135-37 (1996) (concluding that the liquor board's power to grant or transfer a liquor license did not include the power to impose restrictions on the license, because liquor boards do not have broad implied powers under the comprehensive legislative scheme governing such boards).[17] The touchstone, as with all questions about the scope of an agency's implied powers under a statute, remains "the General Assembly's intent in empowering an agency and the statutory scheme under which the agency acts." *Thanner Enters.*, 414 Md. at 279. That is, we are guided by the "fundamental premise" that "the actions of an administrative agency must be consistent with the statute that grants it the authority to act." 70 *Opinions of the Attorney General* 135, 135 (1985).

The power of an agency to disapprove thus may imply the "lesser" power to approve with conditions, at least as a general rule, but only if the grant of such an implied power to the agency would be consistent with the purpose of the statute, with the structure of the broader statutory scheme, and with the agency's role under the statute. In particular, the breadth of the agency's express authority remains an important factor in determining the General Assembly's intent as to the scope of implied powers. *See Thanner Enters.*, 414 Md. at 279. And depending on the circumstances, it may also be less likely for an agency to have implied powers when those implied powers would conflict with or intrude upon express powers vested in another entity or official. *See* 96 *Opinions of the Attorney General* 36, 47-48 (2011) (reasoning that a county's power to create offices does not imply power to call special election to fill them, in part because General Assembly has reserved the power to regulate elections); 62 *Opinions of the Attorney General* at 724-28 (concluding that Board of Public Works lacked authority to order negotiations between the Transit Administration and particular

---

[17] *See also* Michael Herz, *Justice Byron White and the Argument That the Greater Includes the Lesser*, 1994 B.Y.U. L. Rev. 227, 242, 244-47 (1994) (pointing out that the argument that the greater power includes the lesser is not always logically sound, including, for example, when the purported "lesser" power is not, in fact, a subset of the "greater" one).

bidders because the Board could not "intrud[e] into the selection process which the Legislature intended to be conducted" by the Transportation Professional Services Selection Board).[18]

Under the budget reduction statute that is at issue here, the Board's role is a narrow one: to approve or disapprove the reductions proposed by the Governor. *See* Curran Letter at 3. It is the Governor, rather than the Board, who has been given the discretion under the statute to determine which reductions to propose. *See* SFP § 7-213 (allowing the Governor, "with the approval of the Board of Public Works, [to] reduce, by not more than 25%, any appropriation . . . that *the Governor* considers unnecessary" (emphasis added)). The Board merely acts as a check, albeit an important one, on the Governor's broad discretion. *See Judy*, 331 Md. at 264 (characterizing Board approval as one of the "safeguards" that "circumscribe the Governor's exercise of authority while allowing a necessary degree of flexibility"). The Board's role in approving budget reductions, relative to the Governor, is thus not directly comparable to the General Assembly's power to "strike out or reduce" items in the Governor's budget proposal. In that context, the General Assembly may decide for itself which items to strike or reduce and the amount of any reductions, *see* Md. Const., Art. III, § 52(6), whereas the Board is limited under SFP § 7-213 to approving or disapproving the reductions proposed by the Governor.

The narrowness of the Board's role under the budget reduction statute is perhaps further underscored by the fact that predecessor versions of the statute, enacted as part of the budget bills in 1933 and 1935, had vested *the Board* with the plenary power to "reduce or eliminate any appropriation which it may deem unnecessary," rather than vesting the Governor with the primary responsibility for making such reductions and giving the Board a secondary role in approving the reductions. *See* Part I.B, *supra* (citing 1933 Md. Laws, ch. 597, § 11; 1935 Md. Laws, ch. 92, § 11). That shift may suggest a conscious choice on the Legislature's part to limit the Board's power and to maintain the Governor's "preeminent role," *Judy*, 331 Md. at 259, in the budget process, constrained only by the up-or-down approval or disapproval of the Board.

---

[18] *But see Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 75 (1999) (noting that, depending on the statutes at issue, "[m]ore than one administrative agency can have jurisdiction over a matter").

Under this particular statute, therefore, the Board has far more limited powers than was the case in our prior opinions finding that the Board had the implied power to impose conditions on its approval of certain actions. *See* 64 *Opinions of the Attorney General* at 121-23 (involving the Board's "plenary and supreme" authority over the disposition of surplus schools); 62 *Opinions of the Attorney General* at 743 (involving the Board's broad authority to settle obligations owed to the State); *cf.* 61 *Opinions of the Attorney General* at 492-94 (involving a statute that allowed the University of Maryland to expend certain funds only "if *and as* it secures the written approval of the [Board]," which implied an intent to give the Board at least some control (emphasis added)).

That narrower role suggests that the Board might not have the same implied power to impose conditions on its approval in this context as it has in many others. For example, we found that the Board's implied powers were more narrow under a statute that granted the Board the narrow role of approving or rejecting the contractor proposed by an agency, at least in part because the decision about which firm to recommend to the Board was committed to the discretion of that other agency (the Transportation Professional Services Selection Board) under a statute that had "precisely set out" the mechanics of the scheme. *See* 62 *Opinions of the Attorney General* at 723-28. In our view, given the Board's narrow role under the statute, it did not have the implied power, in rejecting a proposed firm, to direct the agency to negotiate with the "second most qualified" bidder, as such an act would "intrud[e]" into the selection process that had been committed to the agency.[19]

---

[19] Although that opinion made clear that the scope of the Board's implied powers were narrower than under some other statutes, it did not resolve whether the Board had the power to impose conditions on its approval and, if so, what kinds of conditions. In fact, the opinion noted in passing that the Board had previously imposed a condition on its approval of a contract under the statute, providing that the contract be subject to the approval of the federal agency that had given grant funding for the project, without questioning the Board's power to impose that condition. 62 *Opinions of the Attorney General* at 721. However, there was no discussion about the Board's authority to impose such a condition, and the need for such a condition might have been implicit in the federal scheme, rather than the State scheme. *See id.* (noting that absent the approval of the federal entity, "there will be no federal participation in the expense of the [relevant part of the project], which would then have to be funded solely by the State"). In the interest of completeness, we also note here that we advised in that opinion that the Board could provide "guidance" to the agency for it to consider when choosing another firm after the first firm was rejected, even though the Board could not require the agency to recommend a particular firm. *Id.* at 728.

*Id.* The statutory scheme that we considered in that opinion is somewhat similar to the statutory scheme at issue here, under which the decision to propose certain reductions is committed to the discretion of the Governor and the Board's role is limited to approving or disapproving the proposed reductions.

What is more, the precedents cited above for the principle that the power to disapprove implies the power to impose conditions also seem to involve administrative schemes under which the agency in question had far broader regulatory or supervisory authority than does the Board under SFP § 7-213. *See, e.g.*, *Lee*, 219 Md. at 215 (involving Montgomery County's "full and complete jurisdiction over its streets and roads"); *Blaker*, 123 Md. App. at 264-65 (involving the broad authority of the Board of Chiropractic Examiners to license and discipline practitioners); *accord Southern Pac. Co.*, 260 U.S. at 208 (involving the broad powers of the Secretary of War over the waters of the United States); *Mello*, 759 N.E.2d at 1203 (involving a broad licensing power); N.C. Op. Att'y Gen., 2003 WL 1154487, at *4 (involving statutory scheme that granted insurance commissioner "broad powers to fulfill his obligations"). Although that does not mean that agencies without as broad authority will never have the implied power to impose conditions on their approval, it does mean that the law is not clear as applied to the Board's especially narrow role under the budget reductions statute.

If the Board had authority to impose conditions on its approval of the Governor's proposed budget reductions, that might also raise constitutional questions, at least under some circumstances. As noted above, the Court of Appeals found that SFP § 7-213 is a valid exercise of the General Assembly's power to enact "such laws not inconsistent with" Article III, § 52 as may be "necessary and proper" to carry out its provisions because the statute "recognizes and perpetuates the preeminent role of the Governor in the budget process" and "merely allows the Governor to accomplish at the end of the budget process what he is required to do when he submits his initial budget," i.e., to ensure that expenditures do not exceed estimated revenues. *Judy*, 331 Md. at 259. Assuming that the Board were to have the power to impose conditions on its approval, however, that might permit the Board to interfere with or intrude upon the Governor's preeminent role in the budget process under the Constitution. That is not to say every condition would itself violate Article III, § 52. But it would be necessary to determine whether any particular proposed condition is "inconsistent with" Article III, § 52, thereby raising a constitutional

question every time a member of the Board proposed a condition. Because courts will typically construe ambiguous statutes to avoid constitutional questions, the constitutional concerns here also weigh in favor of an interpretation that the Legislature did not intend that the Board have the power to condition its approval. *See, e.g.*, *G. Heileman Brewing Co. v. Stroh Brewery Co.*, 308 Md. 746, 763 (1987) ("[I]f a legislative act is susceptible of two reasonable interpretations, one of which would not involve a decision as to the constitutionality of the act while the other would, the construction which avoids the determination of constitutionality is to be preferred." (internal quotation marks omitted)).

Given the narrow role that the Board plays under SFP § 7-213, the Governor's broad authority in the budget context, and the canon of constitutional avoidance, we have serious doubts that the General Assembly intended to grant the Board the implied authority to impose conditions on its approval of reductions to an appropriation under SFP § 7-213.[20] Put another way, considering all of those various factors together, had the General Assembly intended the Board to be able to impose conditions under this particular statutory scheme, our sense is that the Legislature likely would have done so expressly, as it has done under at least some other statutes that confer powers on the Board. *See, e.g.*, Md. Code Ann., Envir. ("EN") § 16-202 (granting the Board the power to impose State wetlands licenses on "terms and conditions the Board

---

[20] Historical practice also weighs against a conclusion that the Board may impose conditions on its approval. We are aware of only one instance when the Board took an action that might arguably be viewed as imposing a condition on its approval under § 7-213. In that instance, the Board approved the Governor's proposed reductions in part but also, among other things, rejected some of the cuts in part and voted to "transfer" the money that had been restored to a particular grant program. *See* Transcript of the Board of Public Works Meeting (Sept. 30, 1992). That action could be viewed as a partial approval of the reductions with the condition that the Governor transfer certain funds to another program. However, the Governor ultimately agreed to the actions recommended by the other Board members—voting to approve them, *see id.*—so it is not clear whether they were indeed conditions on the Board's approval or whether the Board simply persuaded the Governor to take an action that would have been within his authority. In fact, a prior opinion of the Attorney General suggests that the Board would *not* have been able to unilaterally impose such a condition. *Cf.* 21 *Opinions of the Attorney General* at 218-19 (advising that, when the Board had the primary authority to reduce or eliminate appropriations under the predecessor to SFP § 7-213, the Board could not require that the amount saved via the reduction be devoted to a particular purpose).

determines"); EN § 9-422 (allowing the Board to impose conditions in approving financial assistance for certain water supply facilities); SFP § 10-307 (allowing the Board to impose conditions related to the transfer of geothermal resources).[21]

Still, we cannot entirely dismiss the possibility that a court would find that the Board has some limited authority to impose conditions on its approval, especially in light of the general principle that the power to disapprove an action often includes the power to approve conditionally. Any authority that the Board might have, however, would likely be extremely narrow, in keeping with its limited role under the statute and to avoid interfering with the Governor's constitutional role over the budget or conflicting with Article III, § 52.

As a starting point, any power to impose a condition would have to be consistent with the general purpose of § 7-213 and the express powers conferred on the Board. *See, e.g., Lussier*, 343 Md. at 686 ("[I]n determining whether a state administrative agency is authorized to act in a particular manner, the statutes, legislative background and policies pertinent to that agency are controlling."); *Bankers*, 326 Md. at 624 (holding that an agency may not exercise any power that is "inconsistent or out of harmony with" the statute being administered). Here, in light of the purpose of § 7-213 and the limited grant of authority to the Board under that statute, the Board's power to condition, assuming it can impose conditions at all, would have to be narrowly construed as well.

The primary purpose of § 7-213 is to provide a vehicle for controlling State expenditures after the budget bill has been enacted so that the State can "accommodate an unexpected decrease in anticipated State revenues and . . . maintain a balanced budget." 65 *Opinions of the Attorney General* at 48. And the limited power

---

[21] To be clear, we do not express an opinion on any other statutes that provide the Board with authority to approve or disapprove a particular agency's decision without expressly granting the power to impose conditions. *See, e.g.*, Md. Code Ann., Econ. Dev. § 10-212; Md. Code Ann., Nat. Res. § 5-904; Md. Code Ann., Transp. § 6-303. As we have said, the ultimate inquiry must be based on "the General Assembly's intent in empowering an agency and the statutory scheme under which the agency acts," *Thanner Enters.*, 414 Md. at 279, which will necessarily depend on the specific statute at issue. We also do not mean to suggest that an agency needs to have explicit statutory authority to conform its conduct to other laws so as to ensure that it does not perform its powers or duties in an unlawful manner.

delegated to the Board under that statute is to approve (or not approve) the reduction of an appropriation that the Governor "considers unnecessary." Assuming that the Board has the power to approve a reduction under § 7-213 subject to a condition, the condition would have to be consistent with that purpose and the Board's limited role.

Based on those principles, we can say with confidence that certain conditions would clearly be beyond the Board's authority to impose. A condition that makes substantive policy changes, for example, or that has the effect of substituting the Board's budget reduction plan for the Governor's plan clearly would be inconsistent with the statute, which vests in the Governor the exclusive power to decide which appropriations to propose as "unnecessary."[22] Similarly, a condition that calls for the Governor to take other budgetary actions or to implement other cost savings measures would, in our view, clearly be impermissible. The Board also could not require that the amount saved via a budget reduction be rededicated to another purpose. *See* 21 *Opinions of the Attorney General* at 218-19 (reasoning that such a condition would be impermissible, even at a time when the Board had primary authority over budget reductions). And, of course, a condition that is "inconsistent with" Article III, § 52 would not be a valid exercise of the Board's power under SFP § 7-213.

Another clear limiting principle is that the Board may not impose a condition that, in effect, delegates to some other entity or person the discretionary function of approving (or not approving) a reduction proposed by the Governor. That approval function is specifically conferred on the Board by the budget reduction statute, and an agency may not wholly delegate discretionary powers specifically conferred upon in it by statute without express authority from the General Assembly. 61 *Opinions of the Attorney General* 734, 735 (1976) (although the Board could delegate certain discretionary functions to its administrator—provided that the Board gave appropriate preliminary instruction and the actions were subject to subsequent Board review—it could not wholly delegate the duties that were specifically conferred upon it by statute); *see also* 73 *Opinions of the Attorney General* 295, 302 (1988) (explaining that "administrative agencies cannot, in the

---

[22] Thus, for instance, a condition that the Governor bring additional reductions to the Board for its approval likely would be beyond the Board's power. In practice, of course, the other two members of the Board may be able to persuade the Governor to modify the reduction plan. We note, however, that a substantive modification might require new notice under SFP § 7-213(a)(2).

absence of express legislative authorization, delegate powers or functions, particularly those requiring the exercise of discretion or judgment, to others"); 50 *Opinions of the Attorney General* 180, 183 (1965) (advising that the Board of Trustees of the State Colleges may not delegate to its executive director "any of those powers and duties specifically conferred upon it by statute").

Having discussed some conditions that would clearly be beyond the Board's authority, the more difficult question is what conditions might be *within* the Board's authority—assuming that the Board has the power to impose any conditions in the first place—and whether that authority includes the type of condition about which you have asked, namely, one that provides for automatic rescission or reconsideration of the Board's approval upon the occurrence of a specified event. For example, could the Board impose a condition providing for automatic rescission or reconsideration of its approval if the next revenue projections by the Board of Revenue Estimates come in above a certain threshold number?

Given the Board's narrow role under the statute, our view is that, at the most, the Board might have the power to impose procedural conditions that are directly related to the narrow decision before the Board (i.e., the decision to approve or not approve the reduction or reductions proposed by the Governor), that are merely derivative of that narrow authority, and that do not concern any actions or matters unrelated to the specific reduction(s) under consideration. *See Thanner Enters.*, 414 Md. at 279 (explaining that the scope of implied powers depends on "the General Assembly's intent in empowering an agency and the statutory scheme under which the agency acts").

In theory, that standard might permit the Board to impose a condition providing for automatic rescission of its approval if actual or projected State revenues are above a certain level such that the reductions no longer appear to be needed.[23] Such a condition, at least arguably, is directly related to the Board's narrow decision under § 7-213 and is merely derivative of the

---

[23] However, as noted above, in adopting a condition based on revenue estimates, as opposed to actual receipts, the estimates would probably need to be derived using objective criteria to lessen the risk that a court might view the condition as an impermissible delegation of the Board's discretionary power.

Board's power to disapprove the proposed reductions in their entirety.[24]    After all, the availability of funds to support the appropriation seems directly relevant to the decision of whether or not to approve the reduction.   Such a condition also does not impinge on the Governor's authority under the statute to decide which reductions to propose, nor does it seem to interfere with the Governor's broader control over the budget process, at least not any more than would a decision of the Board to disapprove the reductions in their entirety, an action which is unquestionably within the Board's authority.[25]

---

[24] You also have asked whether the Board could impose a condition providing for automatic *reconsideration* upon the occurrence of a specified event.  It is not entirely clear to us what the Board means by automatic reconsideration in this context.  If the Board is contemplating automatic reconsideration of its own vote to approve the proposed reduction (with the condition that the vote will be automatically reconsidered upon the occurrence of some specified condition), that might be inherently self-contradictory; reconsideration of an earlier vote ordinarily nullifies the original vote, *see* Mason's Manual § 468, which in this case would be the vote that mandated reconsideration in the first place.  However, the Board seems more likely to be contemplating a condition providing that (1) the Governor may not implement the reduction until it can be determined if some future contingency is satisfied and (2) if the contingency is satisfied, the Governor can proceed with the reduction, but if the contingency is not satisfied, the Governor can proceed with the reduction only if Board takes a new vote authorizing the reduction.  That latter type of condition would likely be subject to the same analysis as a condition providing for automatic rescission.  That is, if a condition providing for automatic rescission of the Board's approval on certain grounds would be permissible, then this type of condition would likely also be permissible.  But to the extent that the Board is further contemplating that it would be bound to put the matter back on the Board agenda upon the occurrence of the future event, even if the Governor wishes to withdraw his proposed reduction, for example, that would raise additional issues.  We doubt that the Board could preclude the Governor from withdrawing his proposal under those circumstances, and there might also be questions as to whether the Board could bind itself to take a particular action in the future.

[25] If the imposition of such a condition were to create a prolonged period of uncertainty as to the amount of appropriations that will ultimately be available to the affected agencies, the condition could potentially be in tension with the statutory purposes of allowing the State to maintain a balanced budget and to have the necessary flexibility to respond to unanticipated fiscal conditions, as well as with the idea of gubernatorial primacy in the budget process.  We are assuming here that it would be a relatively short period of time until it can be determined

It is not clear, however, what practical use such a condition would have unless the Board were *also* to impose a condition delaying the implementation of the reduction or the effective date of the approval until it can be determined whether the condition requiring automatic rescission has (or has not) occurred. Otherwise, if the reduction has already been implemented, the Board would not be able to rescind or reconsider its approval; the appropriation will already have been reduced as a matter of law, and it could not be added back to the budget by the Board. *See* Part II.A, *supra*. As to whether the Board could require that the approval not go into effect (or the reduction not be implemented) until a later date, it is at least possible that too might be the type of narrow, procedural condition that would not conflict with the statutory design. It is directly related to, and derivative of, the Board's authority to approve the reduction, in that it simply identifies the date on which the Board's approval shall become effective, after which the Governor may implement the reduction, and it is not tied to actions or matters unrelated to the reduction under consideration.[26]

All of that said, the Board could achieve the same result (and avoid the risk that its conditions would be invalidated) simply by deferring its decision on the Governor's proposed reduction or by declining to approve the reduction and encouraging the Governor to bring the matter back to the Board at a later date,[27] during which time the Governor and other members of the Board could further evaluate the State's fiscal situation and the need for making the reduction based on the most up-to-date information. That action would unquestionably be within the Board's authority, would seem

---

whether the condition will or will not be met. If not, that could raise an additional question that would need to be considered.

[26] Although there is little practical difference between a condition delaying the effective date of the approval and one delaying the implementation of the approval until a specified time, a condition that directly prohibits the Governor from implementing a reduction that has been approved might raise more questions than one that merely delays the effective date of the approval. That is because, while the statute grants the Board the power to approve or disapprove the reductions, it does not expressly give the Board any role in *implementing* the reductions once approved. It could be argued, therefore, that a condition directly prohibiting the Governor from implementing a reduction injects the Board into part of the process that has been left to the Governor under the statute.

[27] Nothing in statute precludes the Governor from proposing a reduction previously disapproved by the Board.

to achieve the same result as the conditions about which you asked, and would rest on far safer legal ground. Thus, even if there might be an argument that the Board could impose a condition to delay the effective date of its approval or provide for automatic rescission under certain limited circumstances, we would advise that the Board avoid taking such an action and, instead, defer a vote on the proposed reductions (or decline to approve the proposed reductions) when there is a need to wait for more information.

### III
### Conclusion

To summarize, we conclude that the Board may reconsider and rescind its approval of a reduction under SFP § 7-213 up until the time the reduction takes effect. We have serious doubts, however, that the Board may condition its approval of a reduction under § 7-213. And even assuming the Board has the implicit power to place some conditions on its approval, that power would be extremely narrow. Although we cannot say with certainty that the Board lacks the power to impose a condition providing for automatic rescission of its approval upon the occurrence of a specified condition, at least if that condition were directly related to the narrow decision before the Board and if the reduction had not yet been implemented, we advise the Board against such an approach. The Board can achieve the same result, without the same legal risks, simply by deferring a vote on the reduction (or declining to approve the reduction) until it is satisfied that it has the information it needs to make a fully informed decision.

> Brian E. Frosh
> Attorney General of Maryland
>
> David W. Stamper
> Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice